WELLS, Judge,
dissenting from denial of Rehearing En Banc.
I would grant rehearing en banc, withdraw the majority opinion, and affirm the order of the Department of Community Affairs which adopted the recommended order of the administrative law judge (ALJ), finding the small scale amendment at issue consistent with the Miami Comprehensive Neighborhood Plan. I would do so for the following reasons.
First, the opinion improperly reweighs the evidence in direct contravention of section 120.68(7)(b) of the Florida Statutes which, as pertinent here, expressly provides that although a court may set aside agency action when it finds that “agency action depends on any finding of fact that is not supported by competent, substantial evidence in the record” a court may not “substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact.”
Second, the opinion ignores controlling precedent which establishes that land use planning and zoning are two distinct exercises of sovereign power which must be considered separately. That is, the opinion improperly relies on zoning laws and regulations to support reversal of the underlying administrative orders, in direct contravention of:
• Machado v. Musgrove, 519 So.2d 629, 631 (Fla. 3d DCA1987):
Land use planning and zoning are different exercises of sovereign power, ... therefore, a proper analysis, for review purposes, requires that they be considered separately.
(Citations omitted);
• Martin County v. Yusem, 690 So.2d 1288, 1294 (Fla.1997), holding that an amendment to a comprehensive plan even though combined with a rezoning application, must be considered separate and apart from the rezoning request:
[W]e expressly conclude that amendments to comprehensive land use plans are legislative decisions. This conclusion is not affected by the fact that the amendments to comprehen *289 sive land use plans are being sought as part of a rezoning application in respect to only one piece of property.
(Footnote omitted);
• Board of County Commissioners of Brevard County v. Snyder, 627 So.2d 469, 475 (Fla.1993), confirming that zoning follows planning, not the other way around:
[A] comprehensive plan only establishes a long-range maximum limit on the possible intensity of land use; a plan does not simultaneously establish an immediate minimum limit on the possible intensity of land use. The present use of land may, by zoning ordinance, continue to be more limited than the future use contemplated by the comprehensive plan.
(quoting Marracci v. City of Scappoose, 26 Or.App. 131, 552 P.2d 552, 553 (1976)).
Here, as in Coastal Development of N. Fla., Inc. v. Jacksonville Beach, 788 So.2d 204 (Fla.2001), a landowner applied for a section 163.3187 small scale development amendment to a future land use map (FLUM).[7]' § 163.3187(l)(c), Fla. Stat. (2005). That landowner also sought to rezone its property. The City of Miami, as it was authorized to do, decided to reformulate its policy regarding this property to change its designation on the FLUM from Industrial to Restricted Commercial, based, in significant part, on the analysis of the City’s professional staff. See Coastal Dev., 788 So.2d at 209 (concluding “[b]y its very nature, a proposed amendment to the FLUM, as an element of the comprehensive plan, requires policy reformulation because the amendment seeks a change to the FLUM”).
Petitioners claimed that this amendment was inconsistent with virtually the entire Plan. Following an evidentiary hearing, an ALJ rejected the Petitioners’ claims of inconsistencies as unsupported by the evidence and after considering the testimony of City officials as well as neighboring property owners, concluded that the City’s decision was “fairly debatable”[8] and approved the City’s reformulation of its Plan for this property. The Department of Community Affairs agreed with the ALJ’s assessment and concluded the amendment was “in compliance.”
With competent substantial evidence supporting the Department’s decision and the City’s legislative reformulation of its Plan being fairly debatable, and with Petitioners having failed to demonstrate any inconsistency between that reformulation and the remainder of the Plan, the Department’s determination should have been affirmed.
FACTS
Riverside is the owner of a 4.3 acre parcel of property located on the southern *290 side of the Miami River at 14th Street and Northwest 22nd Avenue. This property is located in the City of Miami and is bounded on the north by the Miami River, on the south by commercial and medium density multi-family residential property, on the west by industrial property, and on the east by 22nd Avenue and the 22nd Avenue bridge which crosses the Miami River. At one time this property was used by Coastal Tug and Barge Company; however, it was not being used by that entity or for marine purposes at the time it was purchased by Riverside.
Riverside sought a section 163.3187 small scale amendment to the Future Land Use Map (FLUM) component of the City’s Comprehensive Plan (the Plan) to change this parcel’s Industrial designation to Restricted Commercial for the purpose of constructing two twelve story condominium buildings with a total of 633 units.
UNDERLYING PROCEEDINGS
Proceedings Before the City Commission
At hearings in July of 2005 and January of 2006, the City Commission considered Riverside’s request to change the FLUM and the property’s zoning. The meeting agendas for each of those hearings reflected the approval of the proposed changes by both the City’s Planning Advisory Board and its Planning Department. As the petition which followed reflected, the City’s planning staff report recommended approval of the FLUM amendment based on the following findings:
• It is found that the proposed Land Use amendment was reviewed in conjunction with an application for a Major Use Special Permit and that the proposed project (as demonstrated in the findings of the companion item) has been found to be in compliance with the applicable design review criteria, subject to meeting the conditions in the project’s development order.
[[Image here]]
• It is found that Goal LU-1(3) promotes and facilitates economic development and the growth of job opportunities in the City.
[[Image here]]
• It is found that Policy LU-1.3.6 states that the City will continue to encourage a diversification in the mix of industrial and commercial activities and tenants through strategic and comprehensive marketing and promotion efforts so that the local economy is buffered from national and international cycles. Particular emphasis is on, but not limited to, Southeast Over-town/Park West, Latin Quarter, Little Haiti, Little River Industrial District, River Corridor, the Garment District and the Omni area.
[[Image here]]
• It is found that Objective LU-1.3 requires that the City encourage commercial, office and industrial development within existing commercial, office and industrial areas; and concentrate new commercial and industrial activities in areas where the capacity of existing public facilities can meet or exceed the minimum standards for Level of Service (LOS) adopted in the Capital Improvement Element (CIE).
[[Image here]]
• It is found that the Industrial category allows 0-units per acre, and the Restrict Commercial category allows up to 150-units per acre; and the attached Concurrency Management Analysis pertaining to concurrency demonstrates that no level of service would be reduced below minimum levels by this change.
The petition further reflects that the City’s staff ultimately concluded:
*291 These findings support the position that the existing land use pattern in this neighborhood should be changed.
The Miami River Commission, a statutorily created advisory board, in a 5/5 tie vote, recommended against the amendment finding it inconsistent with the Miami River Corridor Urban Infill Plan — a plan expressly not adopted by the City.
The amendment to the FLUM was approved by the City Commission in January 2006. On March 2, 2006, Durham Park (an abutting single family neighborhood), the Miami River Marine Group, Inc. (a trade association representing businesses on the Miami River), and Captain Herbert Payne (the owner of P & L Towing and Transport) petitioned the Division of Administrative Hearings for review, claiming that the amendment did not comply with the requirements of Chapter 163 of the Florida Statutes or with the Florida Administrative Code, and that the amendment was internally inconsistent with other provisions of the City’s plan:[9]
1. The City of Miami’s small scale future land use map (“FLUM”) amendment to the comprehensive plan adopted by Ordinance No. 12761 is not in compliance with §§ 163.3184(l)(b), 163.3177(2), 163.3187(2), and 163.3177(6), and Rule 9J-5.005(1), 9J-5.005(2), 9J-5.005(5), 9J-5.005(6), 9J-5.0055, 9J-5.006, and 9J-11.007, F.A.C. Furthermore, the FLUM amendment is internally inconsistent with the city’s comprehensive plan goals objectives and policies related to:
I. Preserving the City’s limited waterfront for water-dependent and water-related commerce, and protecting an essential economic industry in the Miami River corridor known as the “Port of Miami River”;
II. Preventing incompatible future land use patterns;
III. Preventing a future land use pattern resulting in “downtown sprawl” by locating high density residential uses in or near the city center and mass public transit;
IV. Protecting human life and preventing property damage by hurricanes;
V. Protecting native wildlife and habitat; and
VI. Ensuring availability of potable water supply, sanitary sewer capacity and essential infrastructure levels of service.
Proceedings Before the Administrative Law Judge
Prior to hearing, the ALJ struck all reference to Chapter 9J-11 of the Florida Administrative Code as well as a number of claims relating to some thirteen parts (two goals, three objectives and eight policies) of the City’s Plan having no bearing on the requested amendment." The ALJ refused to strike allegations regarding Plan provisions relating to land use development — that is, zoning orders,[10] leaving Petitioners’ claims regarding the following goals, objectives and policies for consideration: Goal LU-1, Policy LU-1.1.1, Policy LU-1.1.2, Policy LU-1.1.10, Objective LU-1.2, Objective LU-1.3, Policy LU-1.3.6, Objective LU-1.4, Objective LU-1.5, Objective LU-1.6, Policy LU-1.6.1, Policy LU-1.6.4, Goal PA-3, Objective PA-3.1, *292 Policy PA-3.1.1, Policy PA-3.1.2, Policy PA-3.1.3, Objective PA-3.3, Policy HO-1.1.9, Policy HO-2.1.4, Goal TR-1, Policy TR-1.1.1, Policy TR-1.5.10, Objective NRI.3, Objective NR-3.2, Policy NR-3.2.1, Policy NR-3.2.2, Policy NR-3.2.3, Goal CM-4, Objective CM-4.1, Policy CM-4.1.6, Objective PW-1.2, Policy PW-1.2.1, Policy CI-1.2.3.iU
The testimony regarding Petitioners’ claims came from seven witnesses, six of whom were called by Petitioners, one of whom was called by both Petitioners and the City. Lourdes Slazyk, a twenty-three-year employee of the City’s Planning Department and the assistant director of that department for the past eleven years (the witness called by both parties), testified that the approved small scale amendment complied with the goals, objectives and policies of, and therefore was consistent with, the City’s Plan. Specifically, Ms. Sla-zyk testified that in 2002 the entire City, with the exception of Watson Island and Virginia Key, was designated as an urban infill area, a designation that facilitates Eastward Ho!, a plan to reduce sprawl beyond the City’s central hub, to decrease the expense of infrastructure expansion where none currently exists, and to halt infringement on the Everglades by bringing people back into the City which is the central part of the County. According to Ms. Slazyk, the instant small scale amendment advances these goals by encouraging high density development in a blighted and underdeveloped area where infrastructure, such as mass transportation systems and utilities, already exist. Ms. Slazyk also confirmed that the amendment encourages redevelopment in the Allapatah Planning District, a declining district located proximate to the Civic Center/Jackson Memorial Hospital University of Miami Medical School complex and makes affordable housing available to the thousands of individuals who are employed there.
Ms. Slazyk also testified that this amendment was consistent with: the Miami River Master Plan, which places this property in the mid-river portion of the Miami River, a transitional area comprised of industrial, commercial (offices and restaurants), and existing residential uses;[11] the FLUM; the City’s urban infill ordinance; and the housing and transportation objectives of the Plan.
Ms. Slazyk also confirmed that the City’s various departments, as well as appropriate county and state agencies (including DERM), analyzed this application and conducted both an investigation and on site analysis of this request. A traffic analysis was also performed regarding this project. With the exception of approval regarding availability of sewer and potable water, which is controlled by the County and the South Florida Water Management District and which must be met prior to permitting as authorized by state law, this amendment satisfied all concurrency requirements.
With regard to the Port of Miami River (POMR) sub-element of the Plan, Ms. Sla-zyk’s testimony was that the Planning Department considered this sub-element and found no inconsistency between the amendment and either this sub-element or the Miami River Master Plan which provides that new housing should be encouraged on lands not reserved for water dependent uses. She further noted that the POMR sub-element is not a statutorily mandated part of the Plan, but was included in the Plan at the City’s option to provide consistency with the County’s mas *293 ter plan. That plan, in turn, simply made provision for existing industrial uses located almost exclusively in the upper river lying west of the 27th Avenue bridge. That, according to Slazyk, is precisely why for the past twenty years the City has interpreted the term “Port of Miami River” as used in this sub-element as applying to the industrial uses located in the upper river rather than to the remaining two thirds of the river comprised mostly of commercial and single and multiple-family residential uses. Ms. Slazyk additionally confirmed that the “Industrial” designation obligates no river-front property owner to use river-front property for industrial purposes — a factor that remains unaltered by changing designations from Industrial to Restricted Commercial and which makes the statement in the Miami River Master Plan that new housing should not be encouraged on lands reserved for water-dependent uses, irrelevant.
By contrast, Jack Luft, a former Director of Planning for the City, was of the opinion that this amendment is inconsistent with the Plan because it does not preserve and encourage expansion of marine industries on the river which, according to him, is required by both the POMR sub-element of the Plan and the Miami River Master Plan. This opinion was premised: (1) on Luft’s interpretation of the term “Port of Miami River” as encompassing not just a collection of shipping industries located on the Miami River, but all shippers as well as any other water-related business, such as tug boat operators, repair and maintenance facilities, parts distributors, and freight forwarders; and (2) on Luft’s conclusion that by permitting “spot amendments” that allow other uses, land values will increase, making it more difficult for this industry to thrive and expand as contemplated by the Plan and the Miami River Master Plan.
This testimony was, however, undermined by Luft’s admission that during his tenure as the Planning Director for the City of Miami, he had never interpreted this term so expansively, and by the fact that many non-water-related and non-water-dependent uses have always existed on that portion of the river involved here. He also admitted that a Restricted Commercial designation, like an Industrial designation, would permit all of the water-related and water-dependent uses that he said were so important to support the shipping industry and that this property is in the Allapattah Planning District, a redevelopment area proximate to thousands of workers who could be served by the high density uses that are to be encouraged in this urban infill area — uses that promote new urbanism, Eastward Ho! and “Smart Growth” which are designed to halt urban sprawl and alleviate pressure on the Everglades by bringing people back to the City.
None of the other witnesses provided any meaningful testimony regarding consistency. Stuart Aguirre, director of the Durham Park Neighborhood Association, testified only about traffic on nearby roadways. Mr. Payne, while admitting that the river was not just a working river but a river of residences as well, opined that allowing this project would hurt future expansion of marine industry; that companies needed a long term reason to invest in the river; and that changing the designation would result in a loss of land for future industrial development. Brett Be-beau, Managing Director of the Miami River Commission testified that the Miami River Commission in a 5 to 5 tie vote found this amendment inconsistent not with the Plan, but with the Miami River Corridor Urban Infill Plan, a plan expressly not adopted by the City. Fran Bohnsack, Executive Director of the Miami River Marine Group, Inc., acknowledged that she could offer no opinion on *294 consistency and even admitted that an Industrial designation on the FLUM did not require marine use. And, Gary Cañero, a marine engineer and seaport consultant, who admitted that he could render no opinions with regard to consistency, testified regarding his experiences with the residents of Fisher Island who complained about the lights, noise, and pollution from the Port of Miami’s cargo gantries.
Based on the extensive testimony and record before him, the ALJ made the following findings:
• For planning purposes, the Miami River has been divided into three sections, the upper, middle, and lower river as demarcated in the Miami River Master Plan adopted in 1992;
• The middle river extends from the 5th Avenue bridge west to the 27th Avenue bridge as shown on the Miami River Master Plan. The upper river extends westerly from the 27th Avenue bridge;
• Riverside’s property is located in the middle river;
• The Miami River Master Plan states that this area contains most of the existing housing located along the Miami River consisting of a wide variety of dwelling types ranging from single family homes to high-rise apartment/condominium buildings, mostly occupied by middle — income households important to the City to support the local economy and tax base; that opportunities remain for development of new housing by building on vacant lots or by increasing the density of existing developed lots; and while new housing should be encouraged, in the proposed SD-4.1 waterfront commercial zoning district residential development should be permitted as an accessory use to a marina;
• This property is located in the proposed — but never enacted — SD-4.1 waterfront commercial zoning district;
• The strategy for the Miami River Master Plan for the middle river is to bring neighborhoods back to the river whereas the plan for the upper river was for a “working river” that was to be protected from displacement by non-water-dependent uses;
• The uses surrounding this property, which is in the middle river, is industrial (a bus and boat engine repair facility), single-family residential, general commercial, duplex residential, medium-density multi-family residential, recreational, public, restricted commercial and high-density multifamily residential;
• This property is located in the Allapat-tah neighborhood development zone which is one of the City’s poorest neighborhoods, a community development target area in need of revitalization;
• One of the goals of the Plan is to revitalize declining areas of the City; revitalizing this area will provide affordable housing for thousands of employees at the Civic Center and the downtown area who want to live near where they work;
• The City has been designated an urban infill area by ordinance to promote Eastward Ho! to make efficient use of utilities, infrastructure and transportation systems;
• The urban infill ordinance adopted ten years after the Miami River Master Plan adds significance to designating the middle river as a transition area for mixed use development which will reverse urban sprawl which takes place at the western edges of the municipality resulting in inefficient use of *295 infrastructure and harms the Everglades;
• The City’s Restricted Commercial designation is consistent with the City’s urban infill designation and the Plan because it includes office, retail and residential uses that curtail vehicle use; because it increases the flexibility for development consistent with the Plan; and
• Public transportation is located near the property which is also served by buses with links to Metrorail and public parking.
The ALJ also found that Petitioners had failed to satisfy their burden of proving that the FLUM amendment was inconsistent with more than twenty other provisions of the Plan, as claimed. Specifically, the ALJ rejected Petitioners’ claim that the requested change was inconsistent with plan Goal LU-l(l), Goal LU-1(3) and Goal LU-1(4).
Goal LU-1, in its entirety states:

Maintain a land use pattern that (1) protects and enhances the quality of life in the city’s residential neighborhoods; (2) fosters redevelopment and revitalization of blighted or declining areas; (3) promotes and facilitates economic development and the growth of job opportunities in the city; (4) fosters the growth and development of downtown as a regional center of domestic and international commerce, culture and entertainment; (5) promotes the efficient use of land and minimizes land use conñicts; and (6) protects and conserves the city’s natural and coastal resources.

Miami Comprehensive Neighborhood Plan, Volume I, Goal LU-1.
The ALJ rejected the notion that changing the designation of this property from Industrial to Restricted Commercial thereby eliminating the “excessive ... noise, smoke, fumes, illumination, traffic, hazardous wastes, [and] negative visual impact[s]” permitted in Industrial areas is inconsistent with the Goal LU-l(l) to protect and enhance the quality of life in Durham Park, a single-family neighborhood that abuts Riverside’s property. In fact, the only inconsistency noted by the ALJ with regard to this goal was Petitioners’ argument that while industrial uses are incompatible with residential uses, an Industrial designation better protects the quality of life for a residential neighborhood than does a Restricted Commercial designation.
The ALJ also found no testimony to support a conclusion that this small scale amendment is inconsistent with Goal LU-1(3), which is to promote economic development and growth of job opportunities in the City. There was no testimony as to how many people were employed at this property before it was re-designated, much less how many will be employed there once the property is redeveloped. Rather, as the ALJ found, because this property is located close to the Civic Center and may provide housing or commercial support for those employed there, changing its designation to permit some use other than its current vacant state cannot be deemed inconsistent with encouraging economic development and growth of job opportunities.
The ALJ similarly found no evidence regarding, and thus no inconsistency with, Goal LU-1(4) dealing with downtown development.
The ALJ found no evidence to support a conclusion that the instant amendment was inconsistent with either Policy LU-1.1.1 or Policy LU-1.1.2:
Policy LU-1.1.1: Development orders [zoning orders] authorizing new development or redevelopment that results in an increase in the density or intensity of land use shall be contingent upon the *296 availability of public facilities and services that meet or exceed the minimum LOS standards adopted in the CIE.
Policy LU-1.1.2: The City’s Planning Department, with the assistance of various City departments and agencies, shall be responsible for monitoring the current and projected LOS provided by public facilities. The Planning Department shall perform the required concurrency review of proposed development for submittal to the State Department of Community Affairs (DCA), as required by Florida statutes and administrative rules.
Miami Comprehensive Neighborhood Plan, Volume I, Policy LU-1.1.1, Policy LU-1.1.2.
Policy LU-1.1.1, as the ALJ noted, relates to zoning and is irrelevant, and, as the ALJ found, no testimony was adduced to show either that this amendment would result in a failure to meet or exceed applicable levels of service or that concurrency requirements had not been met. Miami Comprehensive Neighborhood Plan, Volume I, Policy LU-1.1.1.
The ALJ concluded that Petitioners failed to prove that this amendment was inconsistent with Objective LU-1.2 to “[pjromote the redevelopment and revitalization of blighted, declining or threatened residential, commercial and industrial areas.” Miami Comprehensive Neighborhood Plan, Volume I, Objective LU-1.2. To the contrary, the ALJ noted that the evidence was that this property is located in the Allapattah Planning District, a declining area which, when redeveloped, will make affordable housing available to the thousands who work nearby at the Civic Center. Additionally, the ALJ noted that because this site is designated as a Brownfield clean up site, redevelopment is encouraged by the Plan.
The ALJ also found that no inconsistency with Objective LU-1.3 had been demonstrated because the amendment permits both commercial and office uses, uses encouraged by this objective:
The City will continue to encourage commercial, office and industrial development within existing commercial, office and industrial areas; increase the utilization and enhance the physical character and appearance of existing buildings; and concentrate new commercial and industrial activity in areas where the capacity of existing public facilities can meet or exceed the minimum standards for Level of Service (LOS) adopted in the Capital Improvement Element (CIE).
Miami Comprehensive Neighborhood Plan, Volume I, Objective LU-1.3. Because, as the ALJ found, the concurrency analysis performed by the City confirms that the amendment will not result in a failure of existing public facilities to meet or exceed applicable LOS minimum standards, no inconsistency with the objective was demonstrated.
The ALJ similarly found that Petitioners failed to demonstrate any inconsistency between the amendment and the policy stated in LU-1.3.6 of continuing “to encourage a diversification in the mix of industrial and commercial activities and tenants through strategic and comprehensive marketing and promotion efforts so that the local economy is buffered from national and international cycles” with particular emphasis on the “River Corridor,” among other areas. Miami Comprehensive Neighborhood Plan, Volume I, Policy 1.3.6 (emphasis added). The ALJ noted that the amendment permitted greater flexibility in developing this property thereby complying with this policy.
*297 Objective LU-1.5 stating that “[l]and development regulations will protect the city’s unique natural and coastal resources, and its historic and cultural heritage,” was found by the ALJ to be irrelevant because it deals with land development regulations — zoning—and because no evidence whatsoever was adduced as to this objective. Miami Comprehensive Neighborhood Plan, Volume I, Objective LU-1.5. Policy HO-2.1.4 similarly was deemed irrelevant because it too relates to zoning, providing only for the City to “continue to promote development of new, high quality, dense urban neighborhoods along the Miami River ... through Special District (SD) zoning.” Miami Comprehensive Neighborhood Plan, Volume I, Policy HO-2.1.4 (emphasis added).
The ALJ found that the testimony confirming that Policy LU-1.6.4 had been met was uncontradicted. That Policy requires a concurrency review confirming that a proposed amendment to the FLUM will not result in a LOS that falls below the adopted minimum standards. Miami Comprehensive Neighborhood Plan, Volume I, Policy LU-1.6.4. For the same reason, he found that Goal TR-1 regarding maintenance of an- effective and efficient traffic circulation network had been met. The City’s concurrency analysis, which included a transportation study, determined that the amendment would not result in unacceptable levels of service with respect to traffic circulation. This testimony was not rebutted by any competent substantial evidence.[12]
The ALJ also found no evidence to support a conclusion that the amendment was inconsistent with Policy TR-1.1.1 requiring maintenance of transportation levels of service within designated urban infill areas. Rather, he found Mr. Luft’s testimony that high density development is important to revitalization and the aim of “Smart Growth [of] encouraging people to park and walk or take public transportation” to support a determination of consistency with this policy. Miami Comprehensive Neighborhood Plan, Volume I, Policy TR-1.1.1.
While the ALJ found Policy TR-1.5.10, requiring land development regulations— that is, zoning regulations — to encourage development near large employment centers to minimize commutes, to be irrelevant, he nonetheless noted that the City’s analysis did consider the proximity of this property to the Civic Center with its thousands of employees. Miami Neighborhood Comprehensive Plan, Volume I, Policy TR-1.5.10.
The ALJ found that Petitioners presented no evidence whatsoever on Goal CM^l to ensure “public safetg and protection of property within the coastal zone from the threat of hurricanes Objective CM-4.1, to minimize “the potential for loss of human life and the destruction of property from hurricanes”; and Policy *298 CM-4.1.5 requiring “land use and land development regulation change[s] within the Coastal High Hazard area ... [to undergo] an analysis of its potential impact on evacuation times and shelter needs in the event of a hurricane,” and that they, therefore, had failed to carry their burden on these points. Miami Comprehensive Neighborhood Plan, Volume I, Goal CM-4, Objective CM-4.1, Policy CM-4.1.5. The ALJ similarly found that Petitioners had failed to adduce any testimony whatsoever on Objective NR-1.3 regarding maintenance and enhancement of “the status of native species of fauna and flora”; Objective NR-3.2 to prevent “the degradation of ambient air quality within the city”; and Policy NR-3.2.1 to establish “vehicular transportation patterns that reduce the concentration of pollutants in areas known to have ambient air quality problems.” Miami Comprehensive Neighborhood Plan, Volume I, Objective NR-1.3, Objective NR-3.2, Policy NR-3.2.1. Rather, the ALJ noted that the evidence was that the amendment will eliminate uses involving “excessive amounts of noise, smoke, fumes ... [and] hazardous wastes,” that are permitted in Industrial areas, and would, therefore, be fully consistent with these objectives and policies.
With regard to Policy NR-3.2.2 to encourage “the use of Metrorail and Metrom-over by directing high density new development or redevelopment first to areas nearest Metrorail and Metromover stations, and those land use policies that do not foster proliferation of employment centers in the suburban areas of the county,” the ALJ found no proof of inconsistency because the property is only one mile from Metrorail and Metromover stations to which it is linked by bus service. Miami Comprehensive Neighborhood Plan, Volume I, Policy NR-3.2.2. Moreover, the amendment serves the policy of encouraging redevelopment that does not foster proliferation of employment centers in suburban areas.
The ALJ found Policy NR-3.2.3, providing that the City “[w]ork with the County transportation planning agencies to continue to increase the quality of mass transit services within the city,” to be irrelevant. Miami Comprehensive Neighborhood Plan, Volume I, Policy NR-3.2.3.
The ALJ found no evidence to show that the amendment was inconsistent with the objective stated in Objective PW-1.2: to “[e]nsure adequate levels of safe potable water are available to meet the needs of the city,” or with Policy PW-1.2.1 to “[e]n-sure potable water supplies meet the established level of services standards for transmission capacity of 200 gallons per capita per day (GPCD).” Miami Comprehensive Neighborhood Plan, Volume I, Objective PW-1.2, Policy PW-1.2.1. The un-rebutted testimony was that potable water is provided to the City by Miami-Dade County and that the City relies on the County to determine whether sufficient potable water is available. The City, according to expert testimony, enforces compliance with the County’s determination at the permitting stage. Because there was no testimony that this amendment will result in a shortage of potable water or that this objective does not permit the City to rely on the County’s analysis regarding this criterion, the ALJ concluded that no inconsistency had been demonstrated.[13]
The ALJ also found no evidence to demonstrate that Policy CI-1.2.3 requiring ac *299 ceptable levels of service for recreation and open space, potable water transmission capacity, sanitary sewer transmission capacity, storm sewer capacity, solid waste collection capacity, and traffic circulation, had not been met. Miami Comprehensive Neighborhood Plan, Volume I, Policy CI-1.2.3. Rather, the ALJ found that the City’s concurrency analysis satisfied this policy and had not been rebutted by any evidence.
Finally, the ALJ found no evidence of an inconsistency between the POMR sub-element and this amendment. First, the ALJ noted that this optional sub-element expressly defines the term “Port of Miami River” as fourteen independent, privately owned shipping companies:
The “Port of Miami River” is simply a legal name used to identify some 14 independent, privately-owned small shipping companies located along the Miami River, and is not a “port facility” within the usual meaning of the term. The identification of these shipping concerns as the “Port of Miami River” was made in 1986 for the sole purpose of satisfying a U.S. Coast Guard regulation governing bilge pump outs.
Miami Comprehensive Neighborhood Plan, Volume I, Port of Miami River sub-element, n. 1.
The testimony was that, based on this definition, the City historically considered this element as applying to only the original fourteen shipping companies listed in Volume II of the Plan. While acknowledging Petitioners’ argument that Objective PA-3.1[14] and its Policy PA-3.1.2[15] contemplate that the number of shippers would increase beyond the original fourteen shippers, the ALJ rejected the notion that the City had to consider this sub-element in this case because (1) this property was neither one of the original fourteen “independent, privately-owned shipping companies” nor had it ever been used by any subsequent “independent, privately-owned shipping companfy]”; (2) no other shipping company was located in the vicinity of this property on the same side of the river; and (3) there is no evidence that these provisions were intended to apply to anything other than shippers, that is to all marine industrial uses and to the entire SD^l zoning district on the river including “facilities for construction, maintenance, service, repair, supply or storage of vessels, bases for marine dredging, salvage, towing; marine construction offices and yards; sales, charter or rental of vessels, marine supplies and equipment, marine sporting goods and supplies; and commercial marinas.”
However, the ALJ also concluded that even if this sub-element did apply, no inconsistency between it and the instant amendment had been demonstrated. First, the ALJ determined that no inconsistency between the amendment and Objective PA-3.1 and its three policies could be demonstrated because this objective and its policies all deal with the purpose and scope of land development regulations, *300 that is zoning, issues not relevant to a plan amendment:
Objective PA-3.1: The City of Miami, through its Land development regulations [zoning regulations], shall help protect the Port of Miami River from encroachment by non water-dependent or water-related land uses, and shall regulate its expansion and redevelopment in coordination with the City’s applicable coastal management and conservation plans and policies. Policy PA-3.1.1: The City shall use its land development regulations [zoning regulations] to encourage the establishment and maintenance of water-dependent and water-related uses along the banks of the Miami River, and to discourage encroachment by incompatible uses.
Policy PA-3.1.2: The City shall, through its land development regulations [zoning regulations], encourage the development and expansion of the Port of Miami River consistent with the coastal management and conservation elements of the City’s Comprehensive Plan.
Policy PA-3.1.3: The City shall, through its land development regulations [zoning regulations], encourage development of compatible land uses in the vicinity of the Port of Miami River so as to mitigate potential adverse impacts arising from the Port of Miami River upon adjacent natural resources and land uses.
Miami Comprehensive Neighborhood Plan, Volume I, Objective PA-3.1, Policy PA-3.1.1, Policy PA-3.1.2, Policy PA-3.1.3 (some emphasis added).
Second, he determined that no inconsistency between the amendment and Objective PA-3.2 and Policy PA-3.2.1 had been demonstrated because no issue regarding coordination of surface transportation to the Miami River with the traffic and mass transit systems shown on the traffic circulation map had been presented:
Objective PA-3.2: The City of Miami shall coordinate the surface transportation access to the Port of Miami River with the traffic and mass transit system shown on the traffic circulation map series.
Policy PA-3.2.1: The City of Miami shall, through the Transportation Element of the Comprehensive Plan, coordinate intermodal surface and water transportation access serving the Port of Miami River.
Miami Comprehensive Neighborhood Plan, Volume I, Objective PA-3.2, Policy PA-3.2.1.
Third, he found no inconsistency between the amendment and Objective PA-3 and Policy PA-3.3.1 because Petitioners had failed to adduce any evidence that the City did not coordinate Port of Miami River planning with other port facilities and regulators including the U.S. Corps of Engineers, the U.S. Coast Guard, and Miami-Dade County’s Port of Miami:
Objective PA-3.3: The City of Miami shall coordinate its Port of Miami River planning activities with those of ports facilities providers and regulators including the U.S. Corps of Engineers, U.S. Coast Guard, and Miami-Dade County’s Port of Miami.
Policy PA-3.3.1: The City of Miami, through its Intergovernmental Coordination Policies, shall support the functions of the Port of Miami River consistent with the future goals and objectives of the Comprehensive Plan, particularly with respect to the unique characteristics of the Port of Miami River’s location and its economic position and functioning within the local maritime industry, and the necessity for coordination of *301 these characteristics and needs with the maritime industry that complements, and often competes with, the Port of Miami River.
Miami Comprehensive Neighborhood Plan, Volume I, Objective PA-3.3, Policy PA-3.3.1.
In fact, the evidence with regard to this objective was that pursuant to state law and City ordinance, the City submitted this amendment to the Miami River Commission, which took testimony, considered the application, and made a recommendation to the City Commission. While the River Commission in a tied vote recommended against this amendment, there is no requirement in this objective or otherwise that the City follow the Commission’s recommendation.
Fourth, noting that no studies or analy-ses were introduced into evidence to show either the number of individuals currently holding Port of Miami River jobs or whether such job opportunities had increased or decreased since the Plan was adopted in 1989, the ALJ concluded that the amendment was not inconsistent with Goal PA-3, which states that the Port of Miami River “shall be encouraged to continue operation as a valued and economically viable component of the city’s maritime industrial base.” Miami Comprehensive Neighborhood Plan, Volume I, Goal PA-3. While the testimony was that at least one established boat yard on the river was undergoing a substantial expansion on its existing property and that Captain Payne’s tug boat business was expanding, neither he nor any other marine business had attempted to purchase the property at issue here. As the ALJ noted, neither the City nor its Plan has a “land banking” policy and, by granting the instant amendment, the City did not act contrary to the goal stated in Goal PA-3.
The ALJ also rejected Petitioners’ claim that the amendment was not based on the best available, professionally accepted data and analysis because there was no evidence as to what, if any, more recent or better information and data than that used by the City was available.
Based on these findings and the evidence supporting them, the ALJ concluded that: (1) the Durham Park Neighborhood Association lacked standing because it neither owns nor operates a business within the City; (2) Captain Payne had standing; and (3) Petitioners had failed to prove by preponderance of the evidence that the amendment was either inconsistent with the Plan or that it was not supported by adequate data and analysis. The ALJ recommended that the Department of Community Affairs, the state agency charged with oversight of all municipal comprehensive plans, enter an order approving the small scale amendment granted by the City. See § 163.3164(20), Fla. Stat. (2005) (defining the term “state land planning agency” as the Department of Community Affairs).[16]
Proceedings before the Department of Community Affairs
Petitioners filed extensive exceptions to the ALJ’s recommendations with the Department of Community Affairs complaining about virtually each, if not each, of the ALJ’s findings of fact and conclusions of law, in essence rearguing their entire case. *302 Following review of the entire record, the Department adopted the ALJ’s recommendations with minor exceptions not at issue here.
OUR REVIEW
Proceedings in This Court
Petitioners, Appellants here, appealed from the final order entered by the Department of Community Affairs finding the small scale plan amendment adopted by the City to be “in compliance.” Appellants argue, as they did before the Department: (1) that the Durham Park Neighborhood Association has standing to bring this action; (2) that the City could not rely on Miami-Dade County’s assessment regarding availability of potable water in determining concurrency; (3) that there is no evidence that the instant small scale amendment is compatible with Goal CM-4 governing hurricane preparedness; and (4) that the ALJ’s decision was based on the faulty conclusion that the Port of Miami River sub-element does not apply to preclude the instant small scale amendment.
Not one of these claims supports reversal of the Department’s order.
1.Standing:
First, while I agree that the ALJ erred in concluding that the Durham Park Neighborhood Association did not have standing to prosecute this matter, see Southwest Ranches Homeowners Ass’n, Inc. v. Broward County, 502 So.2d 931, 934 (Fla. 4th DCA 1987), I find this error to be neither dispositive nor relevant in light of the fact that: (1) there is no dispute that the other Appellants who prosecuted this matter had standing; (2) Durham Park and the remaining parties were all represented by the same counsel; (3) Durham Park’s president testified; and (4) Durham Park points to no evidence that it would have adduced but was precluded from adducing as a consequence of this error.
2. Concurrency:
Second, the record confirms that concurrency requirements regarding potable water were met. Section 163.3180(2)(a) governing concurrency expressly authorizes local governments to “consult with the applicable water supplier to determine whether adequate water supplies” will be available and gives these governments until issuance of “a certificate of occupancy or its functional equivalent” to confirm availability. § 163.3180(2)(a), Fla. Stat. (2005). The City may, therefore, by law rely on Miami-Dade County’s assessment regarding availability of potable water in determining concurrency and has a substantial amount of time beyond the date of the enactment of a Plan amendment to obtain such an assessment. That is precisely what the testimony shows that the City is doing in this case.
3. Hurricane preparedness:
Third, Appellants adduced no evidence whatsoever that Riverside’s property is located in a “Coastal High Hazard” area of the City so as to implicate Goal CM-4, Objective CM-4.1, and Policy CM-4.1.5 regarding the potential impact on evacuation times and shelter needs and the potential for loss of human life and destruction of property in the event of a hurricane:
Goal CM-4: Ensure public safety and the protection of property within the coastal zone from the threat of hurricanes.
Objective CM-4.1: Minimize the potential for loss of human life and the destruction of property from hurricanes.
Policy CM-4.1.5: Each proposed future land use map change within the Coastal *303 High Hazard area of the city will require an analysis of its potential impact on evacuation times and shelter needs in the event of a hurricane.
Miami Comprehensive Neighborhood Plan, Volume I, Goal CM-4, Objective CM-4.1, Policy CM-4.1.5.
Therefore, no inconsistency between the instant small scale amendment and this goal, objective, and policy was demonstrated. See § 16S.3187(3)(a), Fla. Stat. (2005) (“In the proceeding, the local government’s determination that the small scale development amendment is in compliance is presumed to be correct. The local government’s determination shall be sustained unless it is shown by a preponderance of the evidence that the amendment is not in compliance with the requirements of this act.”).
4. The Port of Miami River sub-element:
Fourth, no matter how the “Port of Miami River” is defined, the ALJ was correct in concluding that no inconsistency between this sub-element and the instant amendment had been demonstrated.
This sub-element, in pertinent part, provides:
Port of Miami River1
Goal PA-3: The Port of Miami River, a group of privately owned and operated commercial shipping companies located at specific sites along the Miami River, shall be encouraged to continue operation as a valued and economical-Ig viable component of the city’s maritime industrial base.
[1 The “Port of Miami River” is simply a legal name used to identify some 14 independent, privately-owned small shipping companies located along the Miami River, and is not a “Port Facility” within the usual meaning of the term. The identification of these shipping concerns as the “Port of Miami River” was made in 1986 for the sole purpose of satisfying a U.S. Coast Guard regulation governing bilge pump outs.]
Objective PA-3.1: The City of Miami, through its Land development regulations [zoning regulations], shall help protect the Port of Miami River from encroachment by non water-dependent or water-related land uses, and shall regulate its expansion and redevelopment in coordination with the City’s applicable coastal management and conservation plans and policies.
Policy PA-3.1.1: The City shall use its land development regulations [zoning regulations] to encourage the establishment and maintenance of water-dependent and water-related uses along the banks of the Miami River, and to discourage encroachment by incompatible uses.
Policy PA-3.1.2: The City shall, through its land development regulations [zoning regulations], encourage the development and expansion of the Port of Miami River consistent with the coastal management and conservation elements of the City’s Comprehensive Plan.
Policy PA-3.1.3: The City shall, through its land development regulations [zoning regulations], encourage development of compatible land uses in the vicinity of the Port of Miami River so as to mitigate potential adverse impacts arising from the Port of Miami River upon adjacent natural resources and land uses.
Objective PA-3.2: The City of Miami shall coordinate the surface transportation access to the Port of Miami River with the traffic and mass tran *304 sit system shown on the traffic circulation map series.
Policy PA-3.2.1: The City of Miami shall, through the Transportation Element of the Comprehensive Plan, coordinate intermodal surface and water transportation access serving the Port of Miami River.
Objective PA-3.3: The City of Miami shall coordinate its Port of Miami River planning activities with those of ports facilities providers and regulators including the U.S. Corps of Engineers, U.S. Coast Guard, and Miami-Dade County’s Port of Miami.
Policy PA-3.3.1: The City of Miami, through its Intergovernmental Coordination Policies, shall support the functions of the Port of Miami River consistent with the future goals and objectives of the Comprehensive Plan, particularly with respect to the unique characteristics of the Port of Miami River’s location and its economic position and functioning within the local maritime industry, and the necessity for coordination of these characteristics and needs with the maritime industry that complements, and often competes with, the Port of Miami River.
Miami Comprehensive Neighborhood Plan, Volume I, Goal PA-3, Objective PA-3.1, Policy PA-3.1.1, Policy PA-3.1.2, Policy PA-3.1.3, Objective PA-3.2, Policy PA-3.2.1, Objective PA-3.3, Policy PA-3.3.1 (some emphasis added).
1 The stated purpose of this entire sub-element is to “encourage[ ] ... continued operation” of the commercial marine entities which operate on the Miami River. This purpose is to be achieved in three ways: first, by adoption and application of the City’s “Land development regulations” — that is, by its zoning ordinances; second, by coordinating surface transportation; and third, by coordinating POMR planning activities with those of other ports and regulators.
Of these three, only the fust, relating to enactment of zoning regulations to help protect the POMR from encroachment by non water-dependent or water-related land uses, arguably has any application. However, as the ALJ recognized, and as both Machado and Yusem make clear, consideration of zoning ordinances as part of a Plan amendment request is wholly inappropriate.
Appellants also adduced no evidence regarding coordination of surface transportation access to the Miami River with the traffic and transit system shown on the traffic circulation map, and the unrebutted testimony was that the City submitted this amendment to the Miami River Commission, the entity that serves as a clearinghouse for all interests on the river. Thus, based on the record before him, the ALJ correctly concluded that the City’s legislative determination was supported by the record and fairly debatable. That determination, approved as it was by the Department of Community Affairs, should have been affirmed.
This Court’s Opinion and Reconsideration on Rehearing en banc
Although the claims actually raised by Appellants have no merit, this court concluded that the ALJ erred: (1) in refusing to follow this court’s Payne IPs definition of Port of Miami River;[17] (2) in failing to consider inconsistencies between the re *305 quested amendment and (a) the POMR sub-element and (b) the Future Land Use and Coastal Management elements of the City’s Plan; (3) in failing to consider critical sections of the Miami River Master Plan; and (4) in making findings unsupported by the evidence. Payne v. City of Miami, 06-2409, substituted opinion (“Riverside”). The opinion also “note[s]” that “these ‘small scale’ amendments, when viewed together as a whole, are changing the character of the Miami River waterfront without proper long range planning or input from appropriate agencies, departments, and citizen groups.” Id. These determinations ignore both controlling law and the record.
1. No consideration of the cumulative effect of other small scale amendments is appropriate in this case.
There can be no doubt that the driving force behind the instant opinion is the conclusion, stated in the last paragraph, that the instant small scale amendment, when viewed with other pending amendments, improperly changes the character of the Miami River waterfront:
We further note that these ‘small scale’ amendments, when viewed together as a whole, are changing the character of the Miami River waterfront without proper long range planning or input from appropriate agencies, departments, and citizen groups. Because the Miami River is such an important asset to the City, County, and State, such piecemeal, haphazard changes are not only ill-advised, they are contrary to the goals and objectives of those who worked together, debated, and determined how the Miami River waterfront should be developed. If the City’s vision for the Miami River has changed, then that change should be clearly reflected in its Comprehensive Plan to provide industries and land owners along the Miami River with fair notice.

Id.

This conclusion stems from the faulty characterization, made many paragraphs earlier, that section 163.3187, which governs this action, does no more than “limit[] amendments to the Comprehensive Plan.” Section 163.3187(l)(c), however, is not so restricted. While section 163.3187(1) does generally limit amendments to comprehensive plans to no more than two per year, section 163.3187(l)(c) expands amendment rights by authorizing an unlimited number of such amendments “without regard to statutory limits on the frequency of consideration,” where as here, they do not exceed a stated cumulative acreage limit:
(1) Amendments to comprehensive plans adopted pursuant to this part may be made not more than two times during any calendar year, except:
[[Image here]]
(c) Any local government comprehensive plan amendments directly related to proposed small scale development activities may be approved without regard to statutory limits on the frequency ... [when]:
1. The proposed amendment involves a use of 10 acres or fewer and: a. The cumulative annual effect of the acreage for all small scale development amendments adopted by the local government shall not exceed:
(I) A maximum of 120 acres in a local government that contains areas specifically designated in the local comprehensive plan for urban infill, urban redevelopment, or downtown revitalization as defined in s. 163.3164, urban infill and redevelopment areas designated under s. 163.2517, transportation concurrency exception areas approved pursuant to s. 163.3180(5), or regional activity centers *306 and urban central business districts approved pursuant to s. 380.06(2)(e); however, amendments under this paragraph may be applied to no more than 60 acres annually of property outside the designated areas listed in this sub-sub-sub-paragraph. Amendments adopted pursuant to paragraph (k) shall not be counted toward the acreage limitations for small scale amendments under this paragraph.
(II) A maximum of 80 acres in a local government that does not contain any of the designated areas set forth in sub-sub-subparagraph (I).
(III) A maximum of 120 acres in a county established pursuant to s. 9, Art. VIII of the State Constitution.
§ 163.3187(l)(c)l.a.(I)-(III), Fla. Stat. (2005) (emphasis added).
By virtue of these provisions, the Florida Legislature has determined that “piecemeal” changes to a Plan such as the change at issue here, which do not individually or collectively exceed the cumulative acreage identified in the statute, do not change the character of an area or neighborhood so as to require any “long range planning,” or input from any agencies, departments, or groups as the opinion suggests. Moreover, and as the opinion correctly notes, Appellants do not claim that, whether considered alone or in combination with any others, this amendment exceeds the cumulative acreage limitations set by section 163.3187. Thus, notwithstanding this court’s conclusion that such changes are “ill-advised” or “haphazard,” they are, as even Appellants recognized, nonetheless exactly what the law authorizes.
Moreover, this amendment meets all of the criteria set forth in this provision. This amendment involves fewer than 10 acres and therefore satisfies section 163.3187(l)(c)l. Appellants do not claim, and there is no evidence, that the cumulative annual effect of all small scale amendments will exceed statutory limits as a consequence of this amendment. It therefore satisfies section 163.3187(l)(c)l .a. Appellants do not claim, and there is no evidence, that the proposed amendment involves the same property granted a change within the past 12 months or the same owner’s property within 200 feet of the property at issue, thereby satisfying sections 163.3187(l)(c)l.b. and l.c. The proposed amendment involves no text change to the comprehensive plan, but proposes only a land use change to the future land use map, thereby satisfying section 163.3187(l)(c)l.d. The property at issue is not located in an area of critical state concern and therefore satisfies section 163.3187(l)(c)l.e. See § 380.05(1), Fla. Stat. (2005) (authorizing the State Administration Commission to adopt a rule designating an area as one of critical state concern); § 380.05(21), Fla. Stat. (2005) (requiring the state land planning agency to record a legal description of the boundaries of any area designated as an area of critical concern “in the public records of the county ... in which the area ... is located)”; see also § 380.055, Fla. Stat. (2005) (titled the “Big Cypress Conservation Act of 1973,” designating the “Big Cypress Area” as an area of critical state concern); § 380.0551, Fla. Stat. (2005) (designating the “Green Swamp Area” as an area of critical state concern); § 380.0552, Fla. Stat. (2005) (cited in section 163.3187(l)(c)l.e., titled the “Florida Keys Area Protection Act,” designating “the Florida Keys Area as an area of critical state concern”); § 380.0555, Fla. Stat. (2005) (titled the “Apalachicola Bay Area Protection Act,” designating the “Apalachicola Bay Area” as an area of critical state concern). Finally, the proposed amendment involves a residential *307 use in an urban infill area and therefore satisfies section 163.S187(l)(c)l.f. See Miami Comprehensive Neighborhood Plan, Volume I, Policy LU-1.1.11 (“The City hereby adopts designation of the City, excluding Virginia Key, Watson Island and the uninhabited islands of Biscayne Bay ... as an Urban Infill Area pursuant to Miami-Dade County’s designation of an Urban Infill Area”); Policy TR-1.1.1 (“The City hereby adopts designation of the City, excluding Virginia Key, Watson Island and the uninhabited islands of Biscayne Bay ... as an Urban Infill Area pursuant to Miami-Dade County’s designation of an Urban Infill Area”).
Because this amendment satisfies each and every one of these provisions — the only provisions that apply — there was no need for “long range planning” or input from any agencies, departments, or groups as the opinion suggests. This court should, therefore, have confined its consideration to whether the instant small scale amendment was consistent with the remainder of the Plan and supported by the evidence.
2. There is no inconsistency between the Port of Miami River sub-element and this small scale amendment no matter how the term “Port of Miami River” is defined.
The ALJ did not err in determining that there is no inconsistency between the POMR sub-element and the instant small scale amendment.
Section 163.3187 provides that comprehensive plans may only be amended in such a way as to preserve the “internal consistency” of the Plan. § 163.3187(2), Fla. Stat. (2005). Riverside sought to amend only the future land use map element of the City’s plan to change the Industrial designation of this particular property to Restricted Commercial. This change created no inconsistency with the POMR sub-element of the Plan.
First, the record confirms that the ALJ in this case took extensive testimony on the meaning and application of this sub-element. Ms. Slazyk, the current planning director’s representative, testified that she was employed by the City’s planning department when this optional sub-element was adopted. According to Ms. Slazyk, this element was included in the City’s Plan to make it compatible with the County’s Plan which made provision for the heavy industrial uses located in that portion of the river located in the County. The County’s portion of the river, which extends inland or westward from 27th avenue, is known as the upper-river and is where most of the shipping terminals and heavy industrial uses on the river are located. The property at issue here, as Ms. Slazyk confirmed, is located in the mid-river, an area of mixed uses including industrial, commercial, residential, and office uses. In fact, at least two single family residential neighborhoods — one of which is an Appellant here — are located in this section of the river and are in the same neighborhood.
According to Ms. Slazyk, from the time the POMR sub-element was adopted in 1992 through the date of the current applications, this element has consistently been interpreted by the City as applying only to those shipping terminals expressly referred to in the sub-element:
Q. The question was: At the time that the 14 shipping companies were identified by the county, to the best of your knowledge is that a complete list of the shipping companies?
A. To the best of my knowledge, this was the best data available at that time.
Q. Okay. And in terms of the [C]ity’s interpretation of that list, am I correct that the goals, objectives and policies *308 under the Port of Miami Sub-Element only to those 14 shipping companies?
A. The interpretation has been that these are the ones that were identified by definition in the Comprehensive Plan and since it is a defined term, that they apply to that defined term.
Also, Mr. Luft, Appellants’ expert, admitted that during his tenure as Director of Planning for the City, he never interpreted the term “Port of Miami River” as a collection of shipping industries supported by a variety of marine water-related activities rather than as 14 shipping companies as this sub-element expressly states.
On this testimony, the ALJ correctly concluded that the POMR sub-element was limited in application to shipping companies and therefore did not apply to this property. The ALJ rested this determination in part on an analysis of this court’s decision in Payne v. City of Miami, 927 So.2d 904, 908 (Fla. 3d DCA 2005) {Payne II), which reversed dismissal of a circuit court action challenging a zoning determination for lack of standing. Noting that this reversal was predicated on a bare record, the ALJ concluded that on the full evidentiary record before him, this property was not part of the POMR to which this sub-element applied.
This determination notwithstanding, the ALJ still considered this sub-element and concluded no matter how the term “Port of Miami River” is defined (that is, as either “a legal name used to identify some 14 independent privately owned small shipping companies located along the Miami River,” as expressly stated in the footnote to this element[18] or as any other “use” on the banks of the river as stated in Payne II), this change to the land use map creates no internal inconsistency with this part of the Plan.
Second, the ALJ was correct because this limited change to the Plan is not in any manner inconsistent with either the stated purpose or the goals of this sub-element. The single stated goal of this sub-element is to “encourage” continued operation of the POMR, not to ensure its existence at the expense of other property owners on the Miami River:
PORTS, AVIATION AND RELATED FACILITIES
Goal PA-3: The Port of Miami River, a group of privately owned and operated commercial shipping companies located at specific sites along the Miami River, shall be encouraged to continue operation as a valued and economically viable component of the city’s maritime industrial base.
Miami Comprehensive Neighborhood Plan, Volume I, Goal PA-3, (emphasis added).
The manner in which this goal is to be achieved is not through designations on the FLUM, but by enactment of land development regulations, that is, by enactment of zoning ordinances:
Objective PA-3.1: The City of Miami, through its Land development regulations [zoning regulations], shall help protect the Port of Miami River from encroachment by non water-dependent or water-related land uses, and *309 shall regulate its expansion and redevelopment in coordination with the City’s applicable coastal management and conservation plans and policies.
Policy PA-3.1.1: The City shall use its land development regulations [zoning regulations] to encourage the establishment and maintenance of water-dependent and water-related uses along the banks of the Miami River, and to discourage encroachment by incompatible uses.
Policy PA-3.1.2: The City shall, through its land development regulations [zoning regulations], encourage the development and expansion of the Port of Miami River consistent with the coastal management and conservation elements of the City’s Comprehensive Plan.
Policy PA-3.1.3: The City shall, through its land development regulations [zoning regulations], encourage development of compatible land uses in the vicinity of the Port of Miami River so as to mitigate potential adverse impacts arising from the Port of Miami River upon adjacent natural resources and land uses.
Miami Comprehensive Neighborhood Plan, Volume I, Objective PA-3.1, Policy PA-3.1.1,Policy PA-3.1.2, Policy PA-3.1.3. (Some emphasis added).
The instant land use designation change on the FLUM from Industrial to Restricted Commercial cannot, therefore, be incompatible with this objective and its policies for the simple reason that planning is not zoning and changing the Plan does not automatically result in a change in zoning. Snyder, 627 So.2d at 475 (observing “[t]he present use of land may, by zoning ordinance, continue to be more limited than the future use contemplated by the comprehensive plan”).
Third, this change in designation gives rise to no inconsistency with the remainder of the sub-element. The second Objective to this sub-element, Objective PA-3.2, and its single Policy deal with coordinating surface transportation access to the POMR with the mass transit system shown on the traffic circulation map:
Objective PA-3.2: The City of Miami shall coordinate the surface transportation access to the Port of Miami River with the traffic and mass transit system shown on the traffic circulation map series.
Policy PA-3.2.1: The City of Miami shall, through the Transportation Element of the Comprehensive Plan, coordinate intermodal surface and water transportation access serving the Port of Miami River.
Miami Comprehensive Neighborhood Plan, Volume I, Objective PA-3.2, Policy PA-3.2.1.
There is no evidence whatsoever that this Objective and its Policy apply to the instant amendment much less that the amendment is inconsistent with it.
The third Objective, PA-3.3, states only that the City of Miami will “coordinate its Port of Miami River planning activities with those of ports facilities providers and regulators including the U.S. Corps of Engineers, U.S. Coast Guard, and Miami-Dade County’s Port of Miami.” Its single Policy, PA-3.3.1, states that the City, “through its Intergovernmental Coordination Policies,” will support the functions of the Port of Miami River. See Miami Comprehensive Neighborhood Plan, Volume I, Objective PA-3.3, Policy PA-3.3.1. As to this Objective and Policy, the testimony was that this application was submitted to the Miami River Commission, the clearinghouse for all interests on the Miami River, which made a recommendation. This element requires only coordina *310 tion with such an entity; it does not bind the City to its recommendations. The requirements of this Objective and Policy were met.
In sum, this small scale amendment to the FLUM to change the designation of Riverside’s property from Industrial to Restricted Commercial is not inconsistent with this sub-element.
Despite the fact that no inconsistency could be, nor was, demonstrated to exist between the POMR sub-element and the FLUM by virtue of this small scale amendment, the opinion focuses on Objective PA-3.1 of this sub-element and its policy regarding land development regulations — that is zoning ordinances — to conclude that the ALJ erred in not coming to the “inescapable legal conclusion ... that the FLUM amendment is inconsistent with the Comprehensive Plan.” The opinion proceeds to observe:
The Comprehensive Plan’s goals, objectives, and policy considerations regarding coastal areas, and specifically those coastal areas along the Miami River, are in recognition of how important the shipping industry and other water-dependent uses are to the City’s economy.
In view of the importance to the local economy, the limited available areas suitable for high intensity water dependent uses, and strong population pressures of the 1960’s, the City created in the mid 1960’s a zoning classification entitled Waterfront Industrial. This zoning classification strictly prohibits uses that are not directly related to waterfront activities.
[[Image here]]
Since any new water dependent or related facilities would involve redevelopment of existing waterfront properties, these zoning ordinances are considered sufficient to insure that adequate land area for water-dependent or related uses is protected.
[[Image here]]
Along the Miami River, an economic study in 1986 reported that the firms located in the study area ... have a significant impact on the Miami economy. They employ an estimated 7,000 workers on a full time basis and over 600 part time. Total sales are estimated at $613 million, or about $87,000 for a full time worker. An additional indirect impact of $1.2 billion of business activity in the Miami area is created by firms in the study area. Many of the firms located in the study area are marine related businesses in part composed of water dependent and water related activities.
Miami Comprehensive Neighborhood Plan 1989-2000, Volume II, Data and Analysis, Coastal Management Element (emphasis added).
The ALJ, however, failed to consider the importance of the marine industry to the City’s economy or to appreciate that the Industrial land use designation and Waterfront Industrial SD-4 zoning classification was created to protect those uses and to ensure that there will be adequate land area for water-dependent and related uses. Because there was no evidence presented, nor was a study performed, to evaluate the sufficiency of the remaining SD-4 zoned land along the Miami River, in light of the recent and expected future increases in shipping and other related marine services along the river due to the dredging of the Miami River, the ALJ had insufficient evidence to conclude that the FLUM Amendment for this parcel of land is consistent with the *311 Comprehensive Plan and would be beneficial to the community.
Payne, 06-2409, substituted opinion (additional emphasis added).
This conclusion and the analysis by which it is reached directly conflict with the determination made by both the Florida Supreme Court and this court that zoning ordinances must be consistent with a comprehensive plan, not the other way around. Specifically, the conclusion that because “the Riverside property was, for the most part, zoned SD-4.2 Waterfront Industrial ... its land use designation was by necessity, identified as Industrial,” Payne, 06-2409, substituted opinion, is directly contrary to the determination in Snyder that “[t]he local plan must be implemented through the adoption of land development regulations [zoning ordinances] that are consistent with the plan.” Snyder, 627 So.2d at 473, 474 (citation omitted) (“Because an order granting or denying rezoning constitutes a development order and development orders must be consistent with the comprehensive plan, it is clear that orders on rezoning applications must be consistent with the comprehensive plan.”); see also Coastal Development, 788 So.2d at 209 (stating that “a proposed zoning change ... must be consistent with the FLUM”); Machado, 519 So.2d at 632 (observing “local comprehensive plans ... are not zoning laws. [Chapter 163] require[s] that all zoning action conform to [the] approved land use plan”). As these decisions confirm, zoning follows planning; planning is not affected by zoning. Thus, the statement that because this property was zoned SD^4.2 it necessarily had to be designated as Industrial is wholly inimical to controlling law.
Likewise missing the point is the suggestion the instant amendment should be found inconsistent with the Plan because “the FLUM Amendment will permit residential use, a land use specifically precluded by the SD-4.2 land development classification ... Thus, by changing the land use, the FLUM Amendment by exclusion, dramatically changes the land development uses.” Payne, 06-2409, substituted opinion.
As the Supreme Court in Snyder confirmed, just because the land use designation changes does not mean a rezoning request will or must be granted:
Further, we cannot accept the proposition that once the landowner demonstrates that the proposed use is consistent with the comprehensive plan, he is presumptively entitled to the use.... We do not believe that a property owner is necessárily entitled to relief by proving consistency when the board action is also consistent with the plan.
Snyder, 627 So.2d at 475.
A change in a land use designation does not, therefore, necessarily equate with a change in zoning.
In short, the fact that this parcel of property is zoned SD-4.2, is wholly irrelevant as to whether changing the land use designation of this property from Industrial to Restricted Commercial is consistent with the POMR sub-element. Moreover, because the POMR, as pertinent here, relates to land development orders — that is zoning — it too is wholly irrelevant and can give rise to no conflict with the instant amendment. Thus, I find that this court’s conclusion that the Department’s final order approving the ALJ’s determination had to be reversed because the ALJ failed to take into consideration “the goal, objectives, and policies of the Port of Miami River subelement [which relates to zoning],” is contrary to both the record and controlling law.
*312 3. There is no inconsistency between this amendment and the Future Land Use element of the Plan.
The Future Land Use element sets forth broad goals for the City’s plan as a whole:
FUTURE LAND USE
Goal LU-1: Maintain a land use pattern that (1) protects and enhances the quality of life in the city’s residential neiyhborhoods; (2) fosters redevelopment and revitalization of blighted or declining areas; (3) promotes and facilitates economic development and the growth of job opportunities in the city; (4) fosters the growth and development of downtown as a regional center of domestic and international commerce, culture and entertainment; (5) promotes the efficient use of land and minimizes land use conflicts; and (6) protects and conserves the city’s significant natural and coastal resources.
Objective LU-1.2: Promote the redevelopment and revitalization of blighted, declining or threatened residential, commercial and industrial areas.
Objective LU-1.5: Land development regulations will protect the city’s unique natural and coastal resources, and its historic and cultural heritage.
Objective LU-1.6: Regulate the development or redevelopment of real property within the city to insure consistency with the goals, objectives and policies of the Comprehensive Plan.
Miami Comprehensive Neighborhood Plan, Volume I, Goal LU-1, Objective LU-1.2, Objective LU-1.5, Objective LU-1.6. Changing the designation for this particular property on the FLUM creates no inconsistency with this element internally or otherwise.
The uncontradicted testimony from Ms. Slayzk, the assistant director of Planning for the City,[19] was that this property and a number of others around it are vacant and derelict. According to this witness, this property is located in the mid-River, the section of the river where a mixture of industrial, commercial, office and residential uses currently exist. Both this expert and Appellants’ expert testified that for FLUM purposes, this parcel of property is included in the “Allapattah Planning District” and that the entire City has been designated as an urban infill area.
Concededly as part of the Allapattah Planning District and an urban infill area, this property is subject to both the “Smart Growth” and “Eastward Ho!” programs. The purpose of these programs — as both the City’s and the Appellants’ experts confirmed — is to encourage high density development in the City’s center, thereby halting sprawl and decreasing pressure on infrastructure and natural resources (the Everglades).
*313 Changing the designation of this property, as Ms. Slazyk confirmed, furthers these goals. It also does so, again as confirmed by both experts, by providing inner city housing for some of the 20,000 to 30,000 people, over half of whom do not live in the City, and who work nearby in the Civic Center/Jackson Memorial/Veterans Administration/Cedars Hospital complex. It also results in revitalization of a crime ridden, declining area.
This testimony fully supports the ALJ’s determination that the instant small scale amendment to the FLUM to change the designation of this property from Industrial to Restricted Commercial will satisfy the LU-1 goals of (1) enhancing the “quality of life in the city’s residential neighborhoods”; (2) fostering “redevelopment and revitalization of blighted or declining areas”; (3) promoting and facilitating “economic development and the growth of job opportunities in the city”; (4) promoting the “efficient use of land”; and (5) conserving the City’s natural resources.
Rather than focusing on this testimony which fully supports the ALJ’s determination that the instant change in designation is consistent with this goal, the opinion reweighs the evidence to substitute its judgment for that of the City and the Department of Community Affairs.[20] Spe *314 cifically, the opinion concludes that that the ALJ’s conclusion that “the Allapattah neighborhood, in which the subject property is located, is an area in decline and mixed-use projects that include work forces and affordable housing will help stabilize the area by providing housing opportunities for employees at the Civic Center and in downtown who want to live near where they work,” is (1) not supported by the record and (2) based upon a false premise that the Riverside property is located in Allapattah.
With all due respect to the majority herein, the unrebutted testimony from both the City’s and Appellants’ experts was that this property is located in the “Allapattah Planning District,” and as per the comprehensive plan is in an urban infill area, and as such, is properly designated for revitalization. In addition to the testimony from the City’s expert that a large portion of the Allapattah Planning District is in decline and in need of revitalization, Appellants’ expert testified: (1) property on the river is in need of revitalization; (2) high density development is appropriate in areas designated for urban infill; (3) high density development brings people back to the City thereby fulfilling the goals of decreasing urban sprawl and preserving natural resources such as the Everglades; (4) the City should try to relocate people to properties (such as this) which are close to public transportation thereby decreasing traffic pressures; and (5) it is entirely proper to place a residential area next to an industrial site:
Q. You agree, do you not, that there are properties on the river that are in need of revitalization?
A. [by Appellants’ expert] Yes.
Q. And you agree that the Coastal site is in the Allapattah Planning District, correct?
A. Yes, it is.
[[Image here]]
Q. And in fact, the city of Miami has basically been designated as an Urban Infill Area?
A. Yes, it has.
Q. You would agree, would you not, that high density is not a — that high density is a reasonable designation or use in an Urban Infill Area?
A. Yes, it’s one of them. It would depend entirely on exactly where, but certainly an important part of what Urban Infill is about.
Q. And in fact, would you agree with me that one of the major problems that cities are having right now is traffic congestion?
A. That’s an understatement, yes.
Q. ... In fact, in the greater Miami area, would you agree that there’s an average of close to three cars per family?
A. Yeah, in Miami-Dade County.
Q. Yes. And in fact, one of the ways of dealing with traffic congestion is — would you agree that there is a term called urbanism or the new urbanism?
A. Yes.
Q. And that among other things is that you should not be afraid of high density development in the Urban Infill Area, correct?
A. Yes. I mean, everybody — as I said, it definitely has a proper place. And even though some people are not comfortable with it, it definitely is an important part of revitalizing a city.
*315 Q. Because one of the things you want to do as a planner is to halt the suburban sprawl with various subdivisions that would go into the Everglades, west into the Everglades or endanger the Everglades, correct?
A. Yes, that’s Eastward Ho and Urban Infill.
Q. That’s to bring people back from the western regions so to speak of the city and the county?
A. Correct. Or not let them go there in the first place.
[[Image here]]
Q. You would agree, would you not that it would be proper to permit an industrial site to be maintained and operate next to a residential area?
A. It can be done, yes. It depends on whether there’s shared access and the nature of the residential and whether there are buffers and performance standards applied. It can be done.
Q. Well, do you recall your deposition in the Royal Atlantic case?
A. Yes, I do.
Q. June 80, 2004, tried before Judge Stampelos?
A. Yes, I do.
Q. Do you recall page 58?
“Q. Therefore, in your opinion it would be a proper plan to permit a industrial site, an activity next to a residential area?”
“A. I have no problem with that.”
“Q. None at all?”
“A. None at all.”
Do you recall being asked those questions and giving those answers?
A. Uh-hum.
Q. Yes, sir?
A. Yes, sir.
The ALJ’s conclusion that this property is located in Allapattah, even if imprecise, is, therefore, not only correct but also fully supported by the evidence. So too is his conclusion that it is located in an urban infill area.
Of course, a neighbor’s testimony that traffic will increase if additional uses are permitted in a neighborhood is not competent, substantial evidence on this subject as the opinion apparently concludes. See DeGroot v. Sheffield, 95 So.2d 912 (Fla.1957) (stating that competent substantial evidence is that which a reasonable mind would accept as adequate to support a conclusion); City of Hialeah Gardens v. Miami-Dade Charter Found., Inc., 857 So.2d 202, 204 (Fla. 3d DCA 2003) (observing that “generalized statements in opposition to a land use proposal, even those from an expert, should be disregarded”). Again, we need look no further than Appellants’ own expert, who although having acted as the City’s director of planning for three years, testified that not even he was qualified to testify on the subject. Since there is no other evidence on the subject of traffic congestion, the opinion’s conclusion that strain on traffic makes this change inconsistent with this element, cannot stand.
There is also no testimony as to how this amendment is inconsistent with LU-1(6) which states that the City shall maintain a land use pattern that protects “the city’s significant natural and coastal resources.” (Emphasis added). As for protecting natural resources, the only testimony was that bringing people back to the City center will preserve the Everglades (and thus the City’s water supply) from increasing urban sprawl. There is no testimony as to what the term “coastal resources” encompasses, much less that this change will not protect them. The fact that fifty percent of the properties on the Miami River formerly used by marine industries no longer enjoy such use does not equate with a determi *316 nation that coastal resources — whatever that means — in the entire City are not being protected.
In the absence of any testimony regarding coastal resources in the City, the opinion discerns an inconsistency between this Plan amendment and this element by castigating “piecemeal” small scale amendments such as this, which according to the opinion have resulted since 2000, in a fifty percent decline in the number of properties “designated for marine industrial water-related and water dependent uses along the banks of the Miami river.” Payne, 06-2409, substituted opinion. “Piecemeal” changes are, however, precisely what section 163.3187 authorizes, and a decline in the number of properties designated for marine industrial water related or water dependent uses cannot be equated with a destruction of coastal resources. The coast as a resource still exists, in this case only the manner in which it will be used will change.
No inconsistency between this small scale amendment and this element was demonstrated to exist.
4. There is no inconsistency between this amendment and the Coastal Management element of the Plan.
The instant change also creates no inconsistency with the Coastal Management Element of the Plan. This element states that the City will provide an “adequate” supply of land for water dependent uses by allowing no net loss of acreage devoted to water dependent uses in the “coastal area of the City
Goal CM-3: Provide an adequate supply of land for water dependent uses.
Objective CM-3.1: Allow no net loss of acreage devoted to water dependent uses in the coastal area of the City of Miami.
Miami Comprehensive Neighborhood Plan, Volume I, Goal CM-3, Objective CM-3.1.
Appellants presented no testimony whatsoever as to the “net” number of acres devoted to “water dependent” uses in the coastal area of the City. Nor did they present evidence as to whether this amendment will result in a “net” loss of acreage devoted to such uses in the “coastal area of the City.” More to the point, changing the FLUM designation of this property from Industrial to Restricted Commercial — the change of which is all that is involved in this amendment — implicates no change in water use, dependent or otherwise:
Industrial: The areas designated as “industrial” allow manufacturing, assembly and storage activities. The “Industrial” designation generally includes activities that would otherwise generate excessive amounts of noise, smoke, fumes, illumination, traffic, hazardous wastes, or negative visual impact unless properly controlled. Stockyards, rendering works, smelting and refining plants and similar activities are excluded. Residential uses are not permitted in the “industrial” designation, except for rescue missions, and live-aboards in commercial marinas.
Miami Neighborhood Comprehensive Plan, Vol. I. Interpretation of the Future Land Use Map, p. 18, paragraph 3.
Changing the land use designation of this property to Restricted Commercial, which like the Industrial designation, mandates no water uses at all, cannot, therefore, create an internal inconsistency with this element of the Plan. To get around this result, the opinion falls back on zoning regulations recommended in the Miami River Master Plan:
[Wjhile diversification and mixed-use classifications may be desirable in certain locations along the Miami River, the *317 Comprehensive Plan and the River Master Plan make it clear that these goals only apply to appropriately zoned areas, not to land reserved for waterfront industrial purposes:
Goal CM-3: Provide an adequate supply of land for water dependent uses.
Objective CM-3.1: Allow no net loss of acreage devoted to water dependent uses in the coastal area of the City of Miami.
Miami Comprehensive Neighborhood Plan 1989-2000, Volume II, Data and Analysis, Coastal Management Element: In view of the importance to the local economy, the limited available areas suitable for high intensity water dependent uses, and strong population pressures of the 1960’s, the City created in the mid 1960’s a zoning classification entitled Waterfront Industrial. This zoning classification strictly prohibits uses that are not directly related to waterfront activities.
River Master Plan, 0.2: The function of the Miami River as a “working waterfront” should be preserved. Scarce waterfront land should be reserved, wherever possible, for use by businesses that are dependent on a waterfront location or are essentially related to the maritime economy of the area.
River Master Plan, Urban Design 4.20: New housing construction should be encouraged, except on lands reserved for water-dependent uses.
River Master Plan, Urban Design 4.20, Objective 4.8: Encourage residential development on appropriately zoned lands in the Mid-River area.
Payne, 06-2409, substituted opinion.
This reliance on zoning ordinances as provided for in the Miami River Master Plan is unavailing for two reasons. First, and as already stated, zoning regulations and orders are not relevant to a complian-cy determination:
[L]and development regulations are not relevant to a plan or plan amendment compliance determination. Land development regulations must be consistent with the adopted comprehensive plan, not the other way around. The comprehensive plan is implemented by appropriate land development regulations.
Robbins v. Dept. of Cmty. Affairs, 1997 WL 1432207, at *7 (DOAH Dec. 9, 1997) (citations omitted); Smith v. Panama City, 2005 WL 2484796, 20 (DOAH Oct. 6, 2005) (“ ‘[Cjonsistency with land development regulations is not a compliance criterion,’ because it is not required by the definition of ‘in compliance’ with Subsection 163.3184(l)(b).” (quoting Brevard County v. Dep’t of Cmty. Affairs & City of Palm Bay, Case Nos. 00-1956GM and 02-0391GM, 2002 WL 31846455, at *11 (DOAH Dec. 16, 2002; DCA Feb. 25, 2003))); see also Machada, 519 So.2d at 632.
Second, the Miami River Master Plan, on which this portion of the opinion relies, supports rather than undermines the instant amendment. The Miami River Master Plan is a report that was adopted in principle by the City in 1992. This report or plan has never become, by amendment or otherwise, part of the City’s Comprehensive Plan and cannot, therefore, give rise to any inconsistency with the instant amendment.
Moreover, this plan, devised some thirty years after the studies relied on by the majority, confirms that the economic significance of water dependent and water related uses along the Miami River have been and are in decline:
Problems Facing Small Boatyards and Marinas
*318 While there are a number of boat repair facilities that have a growing business, many of the marinas and small boatyards (under 10 employees) on the Miami River have experienced a contraction in business activity since 1985. In fact, four of the 26 small boatyards and marinas identified in 1985 by the draft Biscayne Bay Aquatic Preserve Management Plan, are no longer in business nor have they been replaced by a marine business.
One factor affecting this decline has been the rapid expansion of competing facilities in Broward County.... The problems for marinas and small boatyards have been deepened by the recessionary climate.... Further, the reputation of the river as a hurricane sanctuary was undermined as a result of statements by the South Florida Water Management District (later retracted) regarding the potential of a wall of flood water being released into the Miami River from the Everglades....
[[Image here]]
[The Seafood Industry]
There have been significant changes in the character of the fishing industry during the last several decades resulting from the level of catch available domestically, competitiveness of U.S. fishing vessels, and the economics of the processing and distribution end of the business.
[[Image here]]
The current level of direct employment in both processing and wholesale activity by Miami River fisheries is 150. In the survey of businesses on the river, comments from the owners of these fish establishments indicated that much of the seafood arrived by truck, and that the Keys and the airport were important sources. Although for many, location on the waterfront is no longer critical to their operation, the Miami River area does provide good access to major arte-rials and the proximity to the ah* and sea ports.
Miami River Master Plan at 1.8,1.10.
While anticipating that the marine shipping industry would likely expand to displace marinas and boatyards, the Miami River Master Plan also recognizes that it would be inappropriate to permit such uses with its “heavy truck traffic ... and unsightly outdoor storage of cargo or construction materials and equipment” to be located in residential neighborhoods, especially since there was room for that industry to grow on parcels already devoted to such use, and because placing such uses in residential neighborhoods was inappropriate:
Ironically, it is ... [the] marine industry — the shipping terminals — that are most likely during the next 5 years to displace the marinas, boatyards, etc.
Miami River Master Plan at 1.12.
Although much of the anticipated growth in the shipping industry can be accommodated by more efficient use of existing terminals and cargo vessels, there will inevitably be new entrepreneurs seeking to open additional shipping terminals along the Miami River. There are approximately 8 acres of vacant or undeveloped land along the river that could be converted to terminal use without a change of zoning. Roughly 38 additional acres could be obtained by displacement of existing marginal businesses. However some of this land is not appropriate for shipping terminals and other industrial uses because it is adjacent to residential neighborhoods.
Miami River Master Plan at 1.7 (emphasis added).
The solution devised by this report was to impose two zoning categories along the *319 river: SD^Ll, Waterfront Commercial, which would permit marinas, boatyards, fisheries, boat sales and service, and mixed use (limited restaurant or residential with water-dependent use), and SD-4.2, Waterfront Industrial, which would permit shipping terminals, marine contractors, commercial shipyards, towing and salvage, and all SD4L1 uses other than residential. See Miami River Master Plan at 1.12. Recognizing that “[i]n certain situations, there needs to be flexibility to incorporate non-water-dependent uses with marine commercial uses to create an economically viable mixed-use waterfront development” to include “the addition of some residential units or a restaurant could help a distressed marina,” the suggested zoning category for this property was SD-4.1, Waterfront Commercial. See Miami River Master Plan at 1.12 — .13.
Thus, even if it were appropriate to consider this report, it would not support a result different from that reached. First, there is no evidence that any of the conditions anticipated by the report, and on which its recommendations were based, have been realized. Second, the report anticipates the necessity encompassed in this amendment. Third, because the report never became part of the City’s Comprehensive Plan, it could not properly be considered in this Plan amendment proceeding. See § 163.3187(2), Fla. Stat. (2005) (“Comprehensive plans may only be amended in such a way as to preserve the internal consistency of the plan”) (emphasis added); see also § 163.3177(2), Fla. Stat. (2005) (providing that the “several elements of the [local] comprehensive plan shall be consistent”). And, finally, consideration of the zoning regulations recommended by this report is wholly inappropriate here. Again, no inconsistency between this amendment and this element has been demonstrated.
CONCLUSION
The City of Miami made a legislative decision to grant a property owner’s application for a small scale amendment to the future land use element of the City’s Plan as expressly permitted by law. When challenged, on administrative review, the ALJ hearing the matter found the City’s decision to be supported by the evidence and “fairly debatable.” The Department of Community Affairs agreed with that determination and found the amendment to be in compliance. Because this decision is fully supported by both the evidence and applicable controlling law, it should have been affirmed. Accordingly, and for the reasons stated herein, I would grant rehearing en banc, withdraw the current opinion and affirm.
GERSTEN, SHEPHERD, and SUAREZ, JJ., concur.
Endnotes
'By law a local comprehensive land use plan must include a number of elements, one of which is a future land use element. The future land use map (FLUM) is a component of the future land use element of the comprehensive plan. See § 163.3177(6)(a), Fla. Stat. (2005).
A comprehensive plan is composed of several elements. One element of the comprehensive plan is the future land use element. The future land use element designates “proposed future general distribution, location, and extent of the uses of land for residential uses, commercial uses, industry, agriculture, recreation, conservation, education, public buildings and grounds, other public facilities, and other categories of the public and privates uses of land.” The future land use map (FLUM) is a component of *320 the future land use element of the comprehensive plan. See Yusem, 690 So.2d at 1292. The FLUM is a pictorial depiction of the future land use element and is supplemented by written “goals, policies, and measurable objectives.”
Coastal Dev. of N. Fla., Inc. v. City of Jacksonville Beach, 788 So.2d at 207-08 (footnotes omitted); see also § 163.3177, Fla. Stat. (2006) (delineating the mandatory and optional elements of comprehensive plans).
" Policy LU-1.5.1: Development orders in the city will be consistent with the goals, objectives and policies contained in the Natural Resource Conservation and Coastal Management elements of the Miami Comprehensive Neighborhood Plan.
Policy LU-1.6.5: The City will continue to use special district designations as a land development regulation instrument for the purpose of accomplishing specific development objectives in particular areas of the city.
Policy PA-3.3.1: The City of Miami, through its Intergovernmental Coordination Policies, shall support the functions of the Port of Miami River consistent with the future goals and objectives of the Comprehensive Plan, particularly with respect to the unique characteristics of the Port of Miami River’s location and its economic position and functioning within the local maritime industry, and the necessity for coordination of these characteristics and needs with the maritime industry that complements, and often competes with, the Port of Miami River.
Goal CM-3: Provide an adequate supply of land for water dependent uses.
Objective CM-3.1: Allow no net loss of acreage devoted to water dependent uses in the coastal area of the City of Miami. Policy CM-3.1.1: Future land use and development regulations will encourage water dependent uses along the shoreline.
Objective LU-1.4: Continue the growth of Downtown Miami, expand its role as a center of domestic and international commerce, further its development as a regional center for the performing arts and other cultural and entertainment activities and develop an urban residential base.
Goal HO-2: Achieve a livable city center with a variety of urban housiny types for persons of all incomes.
Objective HO-2.1: Achieve a livable downtown with a variety of urban housing types for persons of all income levels.
Policy TR-1.5.11: Through enforcement of applicable provisions of Section 14-182 “Transportation Control Measures” of the City Code, the City will seek to require new large-scale development to adopt and enforce measures that will reduce the generation of new single-occupant passenger car trips in areas of high-density development, and encourage the use of multiple-occupant vehicles, including public transit, for home-based work trips. The City will coordinate with the Downtown TMI and South Florida Commuter Services to provide support for transportation demand initiatives undertaken by new developments.
Policy NR-1.1.5: Regulate development on Virginia Key to ensure that there will be no net loss of functional wetlands; that beaches and dune systems on the island will not be degraded or disrupted; and that wildlife habitats and native species of fauna and flora will be protected.
Policy SS-1.3.3: Since the sanitary sewer network is an interconnected, county-wide system, the departments of Public Works and Planning will cooperate with Miami- *321 Dade County WASA Department to jointly develop methodologies and procedures for biannually updating estimates of system demand and capacity.
Policy PW-1.1.1: Since the potable water network is an interconnected, countywide system, the City departments of Public Works and Planning will cooperate with Miami-Dade County WASA Department to jointly develop methodologies and procedures for biannually updating estimates of system demand and capacity, and ensure that sufficient capacity to serve development exists. (See Natural Resource Conservation Policy NR-2.1.4.)
iH Goal LU-1: Maintain a land use pattern that (1) protects and enhances the quality of life in the city’s residential neighborhoods; (2) fosters redevelopment and revitalization of blighted or declining areas; (3) promotes and facilitates economic development and the growth of job opportunities in the city; ... (5) promotes the efficient use of land and minimizes land use conflicts....
Policy LU-1.1.1: Development orders authorizing new development or redevelopment that results in an increase in the density or intensity of land use shall be contingent upon the availability of public facilities and services that meet or exceed the minimum LOS standards adopted in the CIE.
Policy LU-1.1.2: The City’s Planning Department, with the assistance of various City departments and agencies, shall be responsible for monitoring the current and projected LOS provided by public facilities. The Planning Department shall perform the required concurrency review of proposed development for submittal to the State Department of Community Affairs (DCA), as required by Florida statutes and administrative rules.
Policy LU-1.1.10: The City’s land development regulations will encourage high-density residential development and redevelopment in close proximity to Metrorail and Metromover stations, consistent with the Station Area Design and Development Plan for each station. (See Transportation Policy TR-1.5.2 and Housing Policy HO-1.1.9.)
Objective LU-1.2: Promote the redevelopment and revitalization of blighted, declining or threatened residential, commercial and industrial areas.
Objective LU-1.3: The City will continue to encourage commercial, office and industrial development within existing commercial, office and industrial areas; increase the utilization and enhance the physical character and appearance of existing buildings; and concentrate new commercial and industrial activity in areas where the capacity of existing public facilities can meet or exceed the minimum standards for Level of Service (LOS) adopted in the Capital Improvement Element (CIE).
Policy LU-1.3.6: The City will continue to encourage a diversification in the mix of industrial and commercial activities and tenants through strategic and comprehensive marketing and promotion efforts so that the local economy is buffered from national and international cycles. Particular emphasis is on, but not limited to, Southeast Overtown/Park West, Latin Quarter, Little Haiti, Little River Industrial District, River Corridor, the Garment District and the Omni area.
Objective LU-1.4: Continue the growth of Downtown Miami, expand its role as a center of domestic and international commerce, further its development as a regional center for the performing arts and other cultural and entertainment activities and develop an urban residential base.
*322 Objective LU-1.5: Land development regulations will protect the city’s unique natural and coastal resources, and its historic and cultural heritage.
Objective LU-1.6: Regulate the development or redevelopment of real property within the city to insure consistency with the goals, objectives and policies of the Comprehensive Plan.
Policy LU-1.6.1: The “Interpretation of the Future Land Use Plan Map” section of this element, which follows these land use goals, objectives and policies, establishes the activities and facilities allowed within each land use category appearing on the Future Land Use Plan Map, and the City’s land development regulations shall be consistent with this section of the Miami Comprehensive Neighborhood Plan.
Policy LU-1.6.4: Any proposal to amend the City’s zoning ordinance that has been deemed to require an amendment to the Future Land Use Plan Map by the Planning Department, shall require a concurrency review and a finding from the Planning Department that the proposed amendment will not result in a LOS that falls below the adopted minimum standards, and will not be in conflict with any element of the Miami Comprehensive Neighborhood Plan. Based on its evaluation, and on other relevant planning considerations, the Planning Department will forward a recommended action on said amendment to the Planning Advisory Board, which will then forward its recommendation to the City Commission.
Goal PA-3: The Port of Miami River, a group of privately owned and operated commercial shipping companies located at specific sites along the Miami River, shall be encouraged to continue operation as a valued and economically viable component of the city’s maritime industrial base.
Objective PA-3.1: The City of Miami, through its Land development regulations, shall help protect the Port of Miami River from encroachment by non water-dependent or water-related land uses, and shall regulate its expansion and redevelopment in coordination with the City’s applicable coastal management and conservation plans and policies. [The “Port of Miami River” is simply a legal name used to identify some 14 independent, privately-owned small shipping companies located along the Miami River, and is not a “Port Facility” within the usual meaning of the term. The identification of these shipping concerns as the “Port of Miami River” was made in 1986 for the sole purpose of satisfying a U.S. Coast Guard regulation governing bilge pump outs].
Policy PA-3.1.1: The City shall use its land development regulations to encourage the establishment and maintenance of water-dependent and water-related uses along the banks of the Miami River, and to discourage encroachment by incompatible uses.
Policy PA-3.1.2: The City shall, through its land development regulations, encourage the development and expansion of the Port of Miami River consistent with the coastal management and conservation elements of the City’s Comprehensive Plan.
Policy PA-3.1.3: The City shall, through its land development regulations, encourage development of compatible land uses in the vicinity of the Port of Miami River so as to mitigate potential adverse impacts arising from the Port of Miami River upon adjacent natural resources and land uses.
Objective PA-3.3: The City of Miami shall coordinate its Port of Miami River planning activities with those of ports facilities providers and regulators including the U.S. Corps of Engineers, *323 U.S. Coast Guard, and Miami-Dade County’s Port of Miami.
Policy HO-1.1.9: The City’s land development regulations will encourage high-density residential development and redevelopment in close proximity to Metrorail and Metromover stations, consistent with the Station Area Design and Development Plan for each station. (See Land Use Policy LU-1.1.10 and Transportation Policy TR-1.5.2.)
Policy HO-2.1.4: The City will continue to promote development of new, high quality, dense urban neighborhoods along the Miami River, in Central Brickell and in Southeast Overtown/Park West through Special District (SD) zoning.
Goal TR-1: Maintain an effective and cost efficient traffic circulation network within the City of Miami that provides transportation for all persons and facilitates commercial activity, and which is consistent with, and furthers, neiyhbor-hood plans, supports economic development, conserves eneryy, and protects and enhances the natural environment.
Policy TR-1.1.1: The City hereby adopts designation of the City, excluding Virginia Key, Watson Island and the uninhabited islands of Biscayne Bay that have a land use and zoning classification of Conservation, as an Urban Infill Area pursuant to Miami-Dade County’s designation of an Urban Infill Area lying generally east of the Palmetto Expressway and including all of the City of Miami. Within this area, the concentration and intensification of development around centers of activity shall be emphasized with the goals of enhancing the livability of residential neighborhoods and the viability of commercial areas. Priority will be given to infill development on vacant parcels, adaptive reuse of under utilized land and structures, and the redevelopment of substandard sites. Maintenance of transportation levels of service within this designated Urban Infill Transportation Concurrency Exception Area shall be in accordance with the adopted Transportation Corridors level of service standards set forth in Policies TR-1.1.2 and TR-1.1.3 of the Transportation Element of the MCNP. (See Land Use Policy LU-1.1.11.)
Policy TR-1.5.10: Through application of the provisions of its land development regulations, the City shall encourage residential development near large employment centers in order to minimize Commutes within the City and near the large employment centers. The City shall continue to update the land development regulations, as necessary, to ensure the regulations promote residential development near large employment centers and investigate opportunities for mixed-use developments.
Objective NR-1.3: Maintain and enhance the status of native species of fauna and flora.
Objective NR-3.2: Prevent the degradation of ambient air quality within the city.
Policy NR-3.2.1: Establish vehicular transportation patterns that reduce the concentration of pollutants in areas known to have ambient air quality problems.
Policy NR-3.2.2: Support those elements of the Miami-Dade Comprehensive Development Master Plan that encourage the use of Metrorail and Metromover by directing high density new development or redevelopment first to areas nearest Me-trorail and Metromover stations, and those land use policies that do not foster the proliferation of employment centers in the suburban areas of the county. (See Transportation Objective TR-1.5 and associated policies.)
Policy NR-3.2.3: Work with the County transportation planning agencies to contin *324 ue to increase the quality of mass transit services within the city.
Goal CM-4: Ensure public safety and the protection of property within the coastal zone from the threat of hurricanes.
Objective CM-4.1: Minimize the potential for loss of human life and the destruction of property from hurricanes.
Policy CM-4.1.5: Each proposed future land use map change within the Coastal High Hazard area of the city will require an analysis of its potential impact on evacuation times and shelter needs in the event of a hurricane.
Objective PW-1.2: Ensure adequate levels of safe potable water are available to meet the needs of the city. (See Natural Resource Conservation Objective NR-2.1.)
Policy PW-1.2.1: Ensure potable water supplies meet the established level of service standards for transmission capacity of 200 gallons per capita per day (GPCD). (See Natural Resource Conservation Policy NR-2.1.5 and Capital Improvements Policy CI-1.2.3.)
Policy CI-1.2.3: Acceptable Level of Service Standards for public facilities in the City of Miami are: a) Recreation and Open Space — 1.3 acres of public park space per 1000 residents, b) Potable Water Transmission Capacity — 200 gallons/resident/day. (See Potable Water Policy PW-1.2.1 and Natural Resource Conservation Policy NR-2.1.5.). c) Sanitary Sewer Transmission Capacity — 100 gallons/resi-denVday. d) Storm Sewer Capacity — Issuance of any development permit shall require compliance with a drainage level of service standard of a one-in-five-year storm event. For the storm drainage system as a whole, 20 percent of the existing system will be brought to a standard of a one-in-five-year storm event by 2000. e) Solid Waste Collection Capacity — 1.28 tons/resident/year, f) Traffic Circulation— The minimum level of service standard on limited access, arterial, and collector roadways that are not within designated Transportation Corridors is LOS E, with allowable exceptions and justifications therefore, with LOS measured by conventional Y/C methodology. Within designated Transportation Corridors, which include approximately 95% of the roadway mileage within the City of Miami, a minimum LOS E is also maintained, but the measurement methodology is based on peak-hour person-trips wherein the capacities of all modes, including mass transit, are used in calculating the LOS. Specific levels of service by location and mode are set out in Policies 1.1.2 and 1.1.3 of the Transportation Policies in the Miami Comprehensive Neighborhood Plan 1989-2000.

. The opinion which follows contains both footnotes, as indicated by Arabic numerals (1, etc.), and endnotes, as indicated by Roman numerals (i, etc.).

. The fairly debatable standard of review that is to be applied to the instant section 163.3187 small scale amendment is a "highly deferential” standard which mandates approval of such a FLUM amendment where, for any reason, it can be said that such a legislative decision is open to dispute on grounds that make sense:
The fairly debatable standard of review is a highly deferential standard requiring approval of a planning action if reasonable persons could differ as to its propriety. In other words, an ordinance may be said to be fairly debatable when for any reason it is open to dispute or controversy on grounds that make sense or point to a logical deduction that in no way involves its constitutional validity.
Yusem, 690 So.2d at 1295 (citations and initial quotation marks removed); Coastal Development, 788 So.2d at 205 n. 1.

. The parties relied on the August 2004 version of the Miami Comprehensive Neighborhood Plan, which is quoted extensively herein, with emphasis as in original.

. While the ALJ did permit claims addressing those provisions relating to land use development orders, he ultimately concluded that those provisions were inapplicable to this compliancy determination.

. There are, in fact, two residential neighborhoods abutting the river in this area, Spring Garden and Durham Park. Additionally, at least one condominium development and some rental apartments, which also abut the river, are located in this mid-river area.

. Jack Luft, who conceded that he had no expertise in this subject, testified generally about the City’s traffic congestion. Herbert Payne, a tugboat captain, testified that more traffic on the 22nd Avenue bridge would make it more difficult for the bridge to be opened for ships to pass through. And Mr. Aguirre, president of the Durham Park Neighborhood Association, testified about the delays Durham Park residents endure when the 22nd Avenue bridge is open. Such testimony is not competent substantial evidence as to whether level of service requirements will be met. See DeGroot v. Sheffield, 95 So.2d 912 (Fla.1957) (stating that competent substantial evidence is that which a reasonable mind would accept as adequate to support a conclusion); City of Hialeah Gardens v. Miami-Dade Charter Found., Inc., 857 So.2d 202, 204 (Fla. 3d DCA 2003) (observing that “generalized statements in opposition to a land use proposal, even those from an expert, should be disregarded”).

. Section 163.3180(2)(a) of the Florida Statutes, governing concurrency, expressly authorizes local governments to “consult with the applicable water supplier to determine whether adequate water supplies” will be available and has until issuance of "a certificate of occupancy or its functional equivalent” to do so.

. Objective PA-3.1: The City of Miami, through its Land development regulations [zoning ordinances], shall help protect the Port of Miami River from encroachment by non water-dependent or water-related land uses, and shall regulate its expansion and redevelopment in coordination with the City’s applicable coastal management and conservation plans and policies. (Some emphasis added).

. Policy PA-3.1.2: The City shall, through its land development regulations [zoning ordinances], encourage the development and expansion of the Port of Miami River consistent with the coastal management and conservation elements of the City’s Comprehensive Plan. (Some emphasis added).

. See § 163.3187(3)(b) 1-2, Fla. Stat. (2005) ("If the administrative law judge recommends that the small scale development amendment be found in compliance, the administrative law judge shall submit the recommended order to the state land planning agency.... If the state land planning agency determines that the plan amendment is in compliance, the agency shall enter a final order within 30 days following its receipt of the recommended order.”).

. As explained later in this opinion, in Payne v. City of Miami, 927 So.2d 904, 908 (Fla. 3d DCA 2005) (Payne II), this court interpreted the term "Port of Miami River” as encompassing more than just the fourteen shipping companies referenced in the Comprehensive Plan to include other "uses along the banks of the Miami River.”

. That footnote provides:
Port of Miami River1
1 The "Port of Miami River” is simply a legal name used to identify some 14 independent, privately-owned small shipping companies located along the Miami River, and is not a "Port Facility” within the usual meaning of the term. The identification of these shipping concerns as the "Port of Miami River” was made in 1986 for the sole purpose of satisfying a U.S. Coast Guard regulation governing bilge pump outs.

. This testimony from the individual charged in the comprehensive plan with determining concurrency and consistency with the comprehensive plan, is competent substantial evidence. See City of Hialeah Gardens v. Miami-Dade Charter Found., Inc., 857 So.2d 202, 205 (Fla. 3d DCA 2003) (confirming that the testimony of professional staff, when based on "professional experiences and personal observations, as well as [information contained in an] application, site plan, and traffic study” constitutes competent substantial evidence); Palm Beach County v. Allen Morris Co., 547 So.2d 690, 694 (Fla. 4th DCA 1989) (confirming that professional staff reports analyzing a proposed use constituted competent substantial evidence); Metro. Dade County v. Fuller, 515 So.2d 1312, 1314 (Fla. 3d DCA 1987) (stating that staff recommendations constituted evidence); Dade County v. United Res., Inc., 374 So.2d 1046, 1050 (Fla. 3d DCA 1979) (confirming that the recommendation of professional staff "is probative”).

. Needless to say this is contrary to the law and a substantial body of case law. See, e.g., § 120.68(7)(b), Fla. Stat. (2005) (stating that "the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact”); Roche Sur. and Cas. Co., Inc. v. Dep't of Fin. Servs., Office of Ins. Regulation, 895 So.2d 1139, 1141 (Fla. 2d DCA 2005) ("On appellate review of the agency order, the issue for the appellate court is whether the record contains evidence sufficient to support the original finding of fact by the ALJ.”); Yaeger v. Fla. Unemployment Appeals Comm’n, 786 So.2d 48, 51 (Fla. 3d DCA 2001) (concluding that generally speaking, this court may not reweigh the evidence and substitute its findings for those of the referee); Graham v. Estuary Props., Inc., 399 So.2d 1374, 1380 n. 10 (Fla.1981) ("The reviewing court cannot substitute its judgment for that of the agency on a finding of fact or the weight thereof.”); Lenard v. A.L.P.H.A. "A Beginning" Inc., 945 So.2d 618, 623 (Fla. 2d DCA 2006) (observing that "[wjhen reviewing the findings and conclusions of a government agency, this court is not permitted to substitute its judgment for that of the agency if competent, substantial evidence supports the agency's factual findings and the agency correctly applied the applicable statutory criteria. § 120.68(7), (8), Fla. Stat. (2005)”); Young v. Dep't of Educ., Div. of Vocational Rehab., 943 So.2d 901, 902 (Fla. 1st DCA 2006) ("[I]t is the responsibility of the administrative law judge to evaluate and weigh the testimony and other evidence submitted at the hearing to resolve factual conflicts, and to arrive at findings of fact. It is not the role of the appellate court to reweigh the evidence anew.”); Mullins v. Dep’t of Law Enforcement, 942 So.2d 998, 1000 (Fla. 5th DCA 2006) ("When factual findings are reviewed, the court must not substitute its judgment for that of the agency in assessing the weight of the evidence or resolving disputed issues of fact.”); Knight v. Winn, 910 So.2d 310, 312 (Fla. 4th DCA 2005) ("[Tjhis court may not ‘substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact.’ ” (quoting § 120.68(7)(b), Fla. Stat.)); Quevedo v. S. Fla. Water Mgmt. Dist., 762 So.2d 982, 988 (Fla.4th DCA 2000) ("This court is 'prohibited from substituting [its] judgment for that of the agency in assessing the weight of the evidence resolving disputed factual issues.’ ” (quoting Perdue v. TJ Palm Assocs., Ltd., 755 So.2d 660, 666 (Fla. 4th DCA 1999))); Pershing Indus., Inc. v. Dep't of Banking & Fin., 591 So.2d 991, 993 (Fla. 1st DCA 1991) ("If an agency’s interpretation is one of several permissible interpretations, it must be upheld despite the existence of reasonable alternatives.”); Gershanik v. Dep’t of Prof'l Regulation, Bd. of Med. Exam'rs, 458 So.2d 302, 304 (Fla. 3d DCA 1984) (”[T]his court may not substitute its judgment for that of the agency as to disputed findings of fact or as to weight of the evidence.”); Bd. of Regents v. Budjan, 242 So.2d 163, 165 (Fla. 1st DCA 1970) ("It is well settled that the Commission is a fact-finding body and that this Court will not substitute its judgment for that of the trier of fact.”); Pauline v. Lee, 147 So.2d 359, 363 *314 (Fla. 2d DCA 1962) (A reviewing court should not "substitute its judgment for that of the administrative fact finder who heard the testimony and was in a position to evaluate the credibility of witnesses.”).